Arkham Intelligence and Keegan McNamara. Case number 237838. Counsel, hold on one second. Absolutely. Please proceed. Good morning, Your Honors, and may it please the Court. I'm Dylan Esper for Dfinity Foundation. In this case, a shadowy group that nobody ever heard of, and which was funded by a competitor, put out a report falsely accusing my client Dfinity of very serious crimes, including insider trading and defrauding its investors. This was not true. The authors of the report knew it wasn't true, or at least entertained serious doubts about its truth when they published. And the New York Times then picked up their false report and turned it into a hit piece story in the process, ignoring all sorts of red flags that the report was not credible and was a hit piece. Since publishing their report on Dfinity, the complaint alleges that Arkham has never again published any analysis on any other company. The district court held that this failed to state a claim for defamation and did not permit Dfinity to amend its complaint. Those decisions were both erroneous as a matter of law. At the outset, a word about standard of review. Because this is a motion to dismiss, we're limited to the four corners of the complaint and matters traditionally noticeable. Arkham's brief contains an extensive counter-statement of facts, which was completely impermissible. And I did want to note our request that the court disregard that. The first issue I'd like to cover is whether this was an opinion, because that is briefed by all the parties here. First, the report is not an opinion because it states facts. The claim that there is insider trading is a fact. It either happened or it didn't. What about when there is a statement that says we suspect that. X. Is that an opinion? Is that a fact? Under New York law, how are we to assess that? So, first of all, under federal law, there's two issues there. There's New York law and federal law. Under federal law, the Supreme Court was very clear in Milkovich that just because something is framed in the form, in my opinion, Joe is a thief, it doesn't mean that it's not actionable as a statement of fact. It still states a fact. The New York test asked what the reader would perceive. So, if indeed this court looks at the definitive Arkham report and concludes that those qualifiers actually do tell the reader as a matter of law, such that we would not be able to convince a jury otherwise or convince a judge to get us to a jury, that this was an opinion and that nobody should take these statements as factual statements, that would be one thing. But we don't think that's true here. The boundaries of opinion, of the exemption for opinions, has always been pretty confusing. But the big stumbling block for libel cases for the last 50, 60 years, has been the Sullivan Rule. And if you lose under the Sullivan Rule, if there's no reason to believe that there's any doubt about the veracity on the part of the defendants of what they published, or they were not reckless in the face of likely falsity, we don't need to consider opinion. Isn't that right? Your Honor is absolutely correct, and the Sullivan Rule is important here, and obviously actual malice has been briefed by all the parties. It's a different analysis with respect to the two sets of defendants. There's the Arkham defendants on the one hand, there's the New York Times on the other. With respect to Arkham, we have the Morrell video, and we were not allowed to amend our complaint to add it to our complaint, because the District Court, in our opinion, erred on that. But the Morrell, yes, the Morrell video, in that video, they admit that they left the wallet IDs out of the report and the transaction data out of the report, and admits the reason they did it was because the third-party explorer that they had used was unreliable and was known to be unreliable. In other words, that's basically admission that they deliberately didn't include and disclose facts in the report, which is what... Does that go to, I'm sorry, I think you were finishing your thought there, but on this question of whether or not they knew what they were putting out was false, or were in, I guess, reckless disregard of that, I don't see how, well, first of all, whether or not we should even be considering the video, which is, I guess, an issue, but even if we were to consider that, I don't see something that suggests that they knew, or had recklessly disregarded, that their statements were false. Can you explain that? The fact that there's a statement saying here's why we didn't include the wallet addresses, and some people, you know, whatever the explanation is, how does that go to they knew it's false? Well, the standard isn't knowing it's false. Knowing or reckless disregard as to whether or not it's false, what points to that? So, I think this is the equivalent of the Hart-Hanks situation, where the reporter had the tape recording, and just didn't listen to it. What happened here is that what you see from that evidence is that Arkham knew that there were problems with their third-party explorer. They, therefore, didn't even know if these transactions that they were purportedly analyzing were the actual transactions they were talking about. And they deliberately didn't disclose those facts to the reader because they didn't want readers to check them. That's scienter. That's knowledge. I guess one sort of question I have is, if this analysis is all based on the data, public data on the blockchain, it seems as if your dispute is, well, they haven't disclosed the methodology or the intermediary data sets. If the raw information is out there, how is that? I mean, I'm puzzled by the idea that this can be proven false or not, presumably, or can it? I mean, what's the... In your briefing, you don't really argue, or I didn't take it as an argument that this is actually false. It's more that they haven't disclosed more information about this. But if what they're saying is, all of this is based on the public information on the blockchain, it seems like more that you're questioning that they haven't disclosed the methodology. And that doesn't seem like the right question. Many times in defamation cases, the information is quote, out there. That's not what the opinion based on disclosed facts standards requires. I guess it's the falsity part. What is there to suggest that this is false or that this can be proven false? Well, we pleaded it was false. And that pleading has to be taken as true for purposes of these proceedings. If defendants want to argue that we're wrong and, in fact, DFINITY did engage in insider trading and our client's allocations are false, they have to wait until summary judgment or trial to do that. Here, we're entitled to plead that it was false. We did plead it's false. My client contends that it is false. And that has to be taken as correct for purposes of this proceeding. Are you not relying? But, you know, I think we've got to disaggregate your claims against the New York Times, which, as you point out, is different in terms of the analysis from the claims against the Arkham Intelligence. Would you agree with that? I do agree with that. So, with respect to the Morrell video, I thought that your theory of the case, and really with respect to Arkham, I thought that your theory of the case was that it was a failure to disclose certain facts. In part, that that's the theory. In the report, the report failed to disclose certain facts. And so, opinion based on disclosed facts is not, can't possibly be a viable defense here. Is that correct? Well, we don't think it's an opinion to begin with. We also think if you take it as an opinion, there are undisclosed facts that are implied by the opinion. So, let's assume that we view this as an opinion, then you're relying on the fact of undisclosed facts, correct? Correct. They did not disclose their implied fact that, in fact, these people actually, these insiders actually sold their tokens. They lead up to that with a bunch of facts that they had these tokens, they deposited them in exchanges. But, they didn't actually sell their tokens. Is it your contention that a 12B6 dismissal on the pleadings of the complaint is often an inappropriate vehicle on which to judge the Sullivan Rule because the defendant has not yet had the opportunity at the time of the complaint to set forth factual issues that would show recklessness in the face of likely falsity or belief in non-falsity. I mean, when you think of a complaint, people who are accusing other people of bad things are often likely not to put in to that statement a declaration of reasons why the accusation may be untrue. There's likely to be nothing to suggest the belief in the falsity of what is being, of the accusation being made. So, there's two points in response to that. An ought point and an is point. With respect to the ought point, which I think is what your question went to, I do think there's a problem that plaintiffs, when they're filing these complaints, we don't have access to the defendant's brains. So, we're trying to plead what we can on actual malice. But, it's often circumstantial, it's often inferential, and I would argue we should be able to get those inferences. But, I do have to say, all candor to the court, there have been a number of cases, I may disagree with them, but they're out there, where courts have rejected that argument. I would say, though, that even the courts who rejected that argument, I would argue, would still accept our pleading. Because we do set forth a bunch of facts to support our claims of actual malice. And, we also have the issue of leave to amend. And, specifically, not only do we have the evidence that goes to Morrell, in that video, the moderator says he read the report and, just reading the report, found it to be unreliable and its claims not credible and not based on a methodology that he found credible. Well, if the moderator, we ought to be able to plead that with respect to the New York Times. If the moderator says that on that video, the New York Times had the same report. Did you make that argument to the district court judge? Well, to the district court judge, we simply argued that the standard of review is very lenient for leave to amend. And, we said the Morrell video is filled with all sorts of things that we would add to an amended pleading. We didn't get to that granular level of specificity. In my sense, you focused not on the moderator, but on Mr. Morrell's acknowledgment that the report did not include all of the relevant data. That is right. And, of course, we did. Because that was such an explosive thing. But, our contention is leave to amend is very lenient. And, we should have, even without the Morrell video, we should have gotten leave to amend, honestly. When you say that there are courts who have disagreed, have they disagreed with the proposition that it is precarious to grant a motion to dismiss under 12b-6 on the basis of time solvent when the defendant in the case has not yet had the, well, when the plaintiff has not had discovery and has not had the chance to make a motion for summary judgment pointing to deficiencies in the defendant's reliance on solvent? Well, it's not so much that they explicitly reject that argument, but they've certainly, appellate courts have certainly affirmed dismissals of motions to dismiss where the plaintiff articulated that problem. So, I do want to... Have we done so? I'm not sure if this Court has done so. I know other Courts of Appeal have, and that's why I'm focusing my argument on saying, hey, even if that's true as a background level of law, and I can't do anything about that, we've met the actual malice standard. And, if we haven't met the actual malice standard, we should get leave to amend so that we can try to meet the actual malice standard. As I understand it, those are your two primary arguments. Those are my two primary arguments on actual malice. I'm not asking this Court to remake actual malice law. So, you've reserved some time for rebuttal? Yes, I did, although I went over here. Well, that's okay. We let you go over. So, we'll hear from your friends on the other side. And, as I understand it, we'll hear first from Counsel for Arkham Intelligence, followed by Counsel for the New York Times Company, and last but not least, from Counsel for McNamara. Is that correct? Good morning, Your Honors, and may it please the Court. Andrew Kim for the Arkham Defendants. I'd like to start with Judge Lavelle's last question about actual malice and pleading standards here. In the Bureau case, the Court did say, I believe Judge Lavelle offered the opinion. I have no memory of that case whatsoever. I'm sorry, Your Honor. Bureau, B-I-R-O, Your Honor. The Court did say, in light of the Twombly and Iqbal standards, you have to plead actual malice. You know, there was a prior case by this Court, Church of Scientology v. Behar, B-E-H-A-R, where the Court did say, oftentimes plaintiffs can proceed to discovery, but with the new Twombly and Iqbal standards, you still have to plead actual malice to the point where you rise to a level of sufficient factual allegations. And I'd like to start with the facts that the Defendant has alleged here with respect to actual malice. And I'll start actually by addressing the Morrell conversation. Judge Lee, as you pointed out, first of all, I'll note that the Defendant's counsel, my colleague on the other side, I think is mischaracterizing what Mr. Morrell said in the conversation that they're trying to get in through amendment, which is he didn't say that the methodology wasn't reliable. And I don't think the moderator said that either. What he said was, we're concerned that at the time we looked at this information, we were concerned that the information might be tampered with and we didn't want to link to it. Judge Lee, going to your question about is there any indication in Mr. Morrell's conversation of whether there is any obvious reason to doubt the veracity of the information, the third sane among prong, is there any reason to doubt the veracity of the information? Mr. Morrell goes on to say... When you say veracity, you mean accuracy of the information? Accuracy. I apologize, Your Honor. It was being inaccurate there. But what he says, Mr. Morrell says in this conversation is to say, go out there and look at the data yourself. Go out there and write your own scripts and you'll see that the transactions are there. That is not a statement made by someone who doubts the accuracy of the information. And even in the post hoc setting, doesn't satisfy the reckless disregard standard. The other two facts I'd like to... So one of the things that Judge Kaplan seems to have said, one way to read his opinion is that there was no dispute before him, as he understood it, about... Your friend on the other side did not dispute the accuracy of the data or the information. Is that... How can that be right, given what we're seeing on appeal? There is a dispute about the accuracy of the underlying data, is there not? No, Your Honor. I think the dispute here is about the characterizations or the conclusions that Arkham drew in its report based on the data. So just walking through the facts here, there is no dispute, and the other side does not contend in its complaint, that the Treasury had 107 million tokens, that 34 million of those tokens went to 34 different accounts, and that from those 34 accounts, there were 10.7 million tokens transferred to exchanges. Those facts are not contested as false in the complaint. What the complaint does say is that what they claim is false is the conclusion that Arkham drew from the statements that I just told you, that because of the size of the transactions and because of the fact that these 34 million tokens went to these 34 accounts, Arkham concluded this must be insider... These must be insider accounts, and that when they were transferred to the exchanges, Arkham said, well, you transfer tokens to exchanges for the purpose of buying or selling them, they must have been sold. Those are the conclusions that they're challenging, and Arkham made clear throughout its report that those conclusions were speculation based on the data available. So Judge Loyer, there is no challenge to the underlying facts here with respect to... So how do you distinguish this? And I appreciate that very much, and I also appreciate the public nature of the blockchain information, but how do you distinguish this report, particularly the parts of the report that say we suspect that from what Mr. Esper described aptly as a situation where I say I suspect that Mr. Kim is a thief? Well, I can represent to the court that I am not a thief, Your Honor. But I think where you have a situation where there's... If you look to the restatement, Section 566, where the speaker is stating an opinion without any supporting facts, then that implies that there are facts known only to the speaker that support the conclusion. So, for example, Mr. Kim is a thief, or I suspect that Mr. Kim is a thief. If you just stop there, then the speaker might think, oh, there are undisclosed facts that are not being revealed that would support the conclusion that Mr. Kim is a thief, and that is what is defamatory, the undisclosed implied facts. Whereas here, Arkham said what the factual basis of its comments were. It said, here's the data that we looked at. Here are the transactions that we looked at. Based on these transactions, we conclude that these 34 accounts are insider. We suspect that they're insider accounts, and that they transferred these tokens over to the exchanges. And if they did, in fact, sell the tokens, that would explain the precipitous drop in the price of the tokens. And so, you know, I'll just close by saying this on the opinion versus fact distinction. My colleague on the other side emphasizes the fact that, you know, these statements are capable of being proven true or false. That's not the end of the test. That's not the end of the inquiry, Your Honor. If you look at the Immuno AG case, and if you look at the Elias versus Rolling Stone case, particularly the discussion about the podcasts in that case, the courts there say those statements can be proven true or false. In Rolling Stone, for example, whether the fraternity members spoke to each other, that's capable of being confirmed. But it's still speculation that's not subject to – that can't be subject to a defamation action, Your Honors, because at the end of the day – So you say that you provided the factual basis in your report. But when you discuss the 34 insider addresses, when you – I mean, when the report discusses the 34 insider addresses, it provides only broad overviews and aggregate information. Is that correct? That is correct, Your Honor, but there's no specificity requirement as to disclosure. And at the end of the day, the conclusions that Arkham drew were because of the size of the – Well, was there any additional underlying information that was available to Arkham? No, Your Honor. And the other side says, oh, they didn't disclose the addresses, they disclosed the transactions. At the end of the day, that information, because it is anonymized, wouldn't help prove or establish that the addresses were either insiders or not. And in fact, if you decide to look at the Morrell conversation, which for the reasons in our brief, we suggest that the court shouldn't. But if you do look at the Morrell conversation, you go on to see the moderator saying, oh, it's D'Affinity who should release the addresses because they know who their insiders are. And that's the thing that, you know, I think is most troubling here is that D'Affinity says we pleaded what we can, but it's their accounts at the end of the day. They can prove more facts to – sorry, they can – So in your view, it's not enough at the 12B6 stage to simply plead the fact of undisclosed facts? Or is it that under these circumstances as pled, there are no undisclosed facts given the nature of the blockchain? Which one is it? I wouldn't say the nature of the blockchain per se, Your Honor, but the report does not indicate or suggest to the reader that there are any undisclosed facts on which Arkham relied to draw the conclusions that it did about the suspected insiders or the purpose of the transfers. May I ask you about the leave to amend issue? Yes, Your Honor. So as you know, Judge Kaplan didn't even really actually address the request for leave to amend based on the Morrell video and dismissed the complaint without prejudice or dismissed the complaint actually with prejudice. Why isn't that error? Two points, Your Honor. First, we would suggest that the error is harmless because any amendment would be futile. Error? Well, any error, if there is one, would be harmless. And second, if you review the Tamoxifen case that we cited in our brief, Your Honor, the court did say there that leave to amend can be denied implicitly, which is what we think Judge Kaplan did here. And even if the court were to consider what the other side is asking this court to allow amendment for in terms of the conversation Mr. Morrell had on Twitter, at the end of the day, those facts don't change the actual malice analysis, and they do not change the opinion versus conclusion analysis. District Court correctly held that DFINITY failed to state a claim. Even with the amendment, they'd still fail to state a claim. Thank you, Your Honors. Thank you. So we'll hear next from counsel for the New York Times Company. Good morning. Good morning, Your Honor. May it please the court, Dana Green on behalf of the New York Times Company. Your Honor, an issue here is a short article by the New York Times about the potential drivers of a very public crash of a major cryptocurrency. And it is well settled that New York law provides robust protections for speech on matters of public concern generally, and for speech like this one in particular, because courts in New York and in this district have recognized that participants in the market should not be able to chill unfavorable analysis or dialogue about their financial circumstances. At this stage, there are essentially two statements at issue in the New York Times' article. The first is an analogy. The Times described the ICP launch as an initial coin offering and analogized that to taking a stock public. It is an innocuous analogy. It is not defamatory. The district court made short work of it, and this court should, too. The other is two sentences attributed to Arkham appropriately caveated, summarizing their analysis that the ICP launch, some insiders sent billions of dollars of ICP to cryptocurrency exchanges, while smaller investors had a hard time accessing theirs. And the district court correctly dismissed claims premised on those two statements for three reasons, each of which independently requires dismissal and which should be affirmed. The first is that it found those statements in the context of the Times' article to be opinion. It did so because taken as a whole, the article presented Arkham's analysis as one opinion or conjecture or theory as to the cryptocurrency's collapse. As part of an ongoing debate, it directed readers to the report where they could form their own opinions about its rigor and accuracy. It included DFINITY's rebuttal. It included a link to DFINITY's own instructions to small investors where readers could determine whether they thought it was difficult or easy. It included an innocuous explanation. In short, the overall context to a reasonable reader would have conveyed that they were reading a theory as part of an ongoing debate. Second, the district court found that even if those two quotes implied facts, that they were substantially true. I believe that's been adequately addressed by counsel for Arkham. I won't belabor that point. And of course, thirdly, the district court found that DFINITY had failed to plead actual malice adequately. And with regard to actual malice, DFINITY does not point to any evidence in the record, circumstantial or otherwise, that would plausibly show the Times published with knowledge that the report was false or with a high degree of awareness of probable falsity. Which is not surprising because even now, several years later, DFINITY has failed to show the statements are even false. We are prepared to rest on our brief, but I would be glad to respond to any questions that the court may have about the Times' position. Thank you very much. Thank you. I have a problem with the fact that this comes up under 12B6. And actual malice is a formidable protection of the press, which has really resulted since the decision of Sullivan in the press being almost untouchable, at least the reputable press. But nonetheless, in order to prevail on actual malice, the plaintiff must show states of mind of the Times, states of mind that are likely to be kept secret. If somebody publishes a defamatory statement about somebody else, they're unlikely to reveal in that defamatory statement their own doubts about the veracity of their story, if they have them. And they are very likely to emphasize factual matter that supports it and to scuttle off to one side or outright conceal a factual matter of which the writer is unaware, which undermines it. And I wonder whether it makes sense too easily to allow courts to grant a 12B6 dismissal without the opportunity of the plaintiff to make inquiry, to take any discovery that would support a showing of actual malice. Does that make sense?  As far as you could say, well, you know, Iqbal is Iqbal, and a lot of the same things are true of fraud accusations. But nonetheless, talking about libel, can you address that? Yes, Your Honor. You're correct. It is a formidable barrier. And this court and, of course, the Supreme Court, including in St. Amant, has stated that it's a deliberately high barrier in order to facilitate the free flow of information and dialogue. I'm talking about just the 12B6? Yes, even at a 12B6 standard. We learned, of course, not so long ago in the Palin case that it is not an insurmountable barrier at the 12B6 stage. This court reversed dismissal at that stage, as to the Times. So it is not an impossible standard to meet. And DFINITY has cited to several cases in which actual malice was adequately pled at the motion to dismiss stage. So there are many cases where it is sufficiently pled. So much subject to different cases come up in different ways. And there are plenty of cases in which it's easy for a plaintiff to plead the actual malice and to point to things that would have been known by the defamatory speaker that suggest falsity or suggest recklessness. But then there are other cases where those things exist, but they're virtually impossible for the plaintiff to know about. That may be so, Your Honor, but this is not one of those cases. Why is that? There's just nothing in the record here. What do you mean by in the record? As in what's... This is not a record which has been in discovery, right? You're right, Your Honor. There's nothing in the complaint. There's nothing pled. There's no scintilla that would indicate that the times knew or should have known that the allegations in this report were false. None of the things that DFINITY pleads as evidence of actual malice have been found to be adequate to show actual malice, both as a matter of law and, frankly, as a matter of logic. There's just nothing there as to the times in this case. And while I understand Your Honor's concerns and in other cases or other hypotheticals, perhaps that would be relevant here, there's just nothing there. I would be happy to engage with any of those allegations they've made if it's useful. But this, to me, does not appear to be a close call or a difficult case when it comes to pleading of actual malice. Well, the one argument is a failure to investigate the claims in the report. And I think that the argument is that that failure by itself is indicative, at least sufficiently so, at the 12B6 stage of potential actual malice. Your Honor, the failure to investigate alone has been held not to be sufficient to plead actual malice without there being other evidence that should have put someone on notice of falsity first. And second, I would direct Your Honors to the complaint itself, where DeFinity details, particularly in paragraph 32 and paragraph 36C, details the kinds of efforts that the Times made to reach out to DeFinity to seek their comment. The Times emailed them eight questions. DeFinity pleads that they responded with detailed responses. Much of that is quoted in the complaint at paragraph 36. There was a phone call with DeFinity. This is not a case where the Times simply published uncritically allegations in a report without giving the subject of that report an opportunity to rebut them. So to the extent that they are relying on a failure to investigate or a failure to seek comment, I think their own complaint is fatal to that allegation. Thank you. Thank you very much. We'll hear from counsel for McNamara. Good morning, Your Honors. I'm going to defer primarily to my brief where I incorporate by reference the arguments of Arkham and to the extent applicable in New York Times. I hear we're really, you know, Mr. McNamara is a very important person, but we're a minor defendant as far as I can see in this case. Two things I want to emphasize that differentiate him solely from the other defendants. Again, I defer to arguments made by my counsel for other defendants in this case that would also apply to Mr. McNamara. But one is engaging in what's called the group pleading standard. There's no non-conclusory allegations asserted against Mr. McNamara regarding to the acts alleged in this complaint. And number two, there's no allegations that he did anything which is outside his scope of employment, and there's nothing in the complaint that he did independent of his employer at the time, Arkham. And that's really it. I don't have anything else to add. So may I just ask you a question about your friend Mr. Esper's characterization, which is that this is a hit job, and that Arkham Intelligence has issued a report like this only once in connection with this case. Is that accurate? I would have known. Those are two separate questions, but do you know if that's accurate? That it's only been, this is the only time that a report like this has come from Arkham? My knowledge is restricted to the complaint. I would have no knowledge of that. Well, I forgot to ask Mr. Kemp, so you're the minor player who I'm making into a major player. I don't have the answer, Your Honor. Mr. Kemp? With the court's leave, I can go. Your Honor, are you asking about the, on the face of the complaint, or just generally as a factual matter? As a factual matter. As a factual matter, going outside the record, this is not the only report that Arkham has put out. In fact, Arkham has put out, if you look to, actually you can look to the Moreau conversation, if you look to the leave to amend, there's reference to a Celsius report that Arkham put out subsequently talking about the events of that particular token. So I think you can look to that and say it's not just one incident. Arkham's sole purpose was not to publish it. At the time that it was published, it was Arkham's only report? That is correct, Your Honor. But then subsequently it's had other reports? Going outside the four corners of the complaint, yes, Your Honor. Arkham has put out other reports. Thank you, Your Honor. Thank you. And thank you, Mr. Singer. Sorry. No problem. Mr. Esper. Your Honors, I want to start by addressing the New York Times, and specifically with respect to the issue of pleading standards and actual malice. If the Court wants to go in that direction, there's a Supreme Court case from the 1970s called Herbert v. Lando that discusses, now it's pre-Iqbal and Twombly, but it discusses the issue of discovery being key to an actual malice claim. So, you know, the Supreme Court has never repudiated that and didn't talk about it in Iqbal and Twombly. So if the Court wants to go in that direction, it can. Also, I want to talk about the issue of this conversation between the New York Times and Divinity, because it does show actual malice. They had the Arkham report. They knew the most explosive allegation was on insider trading. And that's – with all those questions they asked Divinity, they didn't ask that one because they wanted to publish it, and they didn't want to find out that it was wrong. And this is just like the tape recording in Hart-Hanks. Thank you, Your Honor. Thank you very much, World Reserve decision.